IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DENISE GIBSON                          :          CIVIL ACTION
                                       :
                                       :
             v.                        :
                                       :
                                       :
HARTFORD LIFE AND ACCIDENT             :          NO.  2:06-CV-3814-LDD
INSURANCE COMPANY                      :

MEMORANDUM

LEGROME D. DAVIS, J.                                            JUNE 27, 2007

Presently before the Court is Defendant's Motion for Summary Judgment (Doc. No. 13)

and Plaintiff's Response thereto (Doc. Nos. 15, 22).  For the reasons that follow, Defendant's

Motion is granted.

**I. Background**

Plaintiff is a former employee of Wal-Mart Stores, Inc.  Upon leaving Wal-Mart, she

received regular payments pursuant to the long term disability plan ("the Plan") that Wal-Mart

provided as part of her employment.  After a little over one year, however, based on the decision

of the Plan's administrator that Plaintiff no longer qualified for benefits, the payments ceased.

The Plan's administrator is Defendant Hartford Life and Accident Insurance Company ("the

Hartford").

Plaintiff first applied for long term disability benefits on February 22, 2005.  (Admin. R.

362-65.)[1]  In order to decide that application, Defendant collected medical records from two of

_____

[1]The pages of the Administrative Record (Doc. No. 16) are Bates stamped HLI00001 -
HLI00378.  In this Order, the pages of the Administrative Record are cited merely as 1 - 378.

1

Plaintiff's attending physicians, Dr. Mohan Gurubhagavatula and Dr. Vidhub Gupta.  On May 5, 2005, Defendant approved long term disability benefits for Plaintiff.  (Admin. R. 248.)  On September 8, 2005, however, Defendant wrote to Plaintiff that, under the terms of the Plan, after February 28, 2006, Plaintiff would  have to meet a new criterion in order to qualify for long term disability benefits.  (Admin. R. 97-98.)  Defendant then collected further medical records from Dr. Gurubhagavatula and ordered an Independent Medical Examination of Plaintiff.  On April 12, 2006, Defendant wrote to Plaintiff that it had decided Plaintiff no longer qualified for long term disability benefits.  (Admin. R. 148-50.)  Plaintiff then informed Defendant that she wished to appeal the decision.  (Admin. R. 121.)  She forwarded to Defendant a letter from Dr. Gurubhagavatula "to whom it may concern," which letter stated that "[u]ntil future notice, [Plaintiff] cannot work."  (Admin. R. 131-32.)  Defendant then ordered a medical review of Plaintiff's records, and on May 26, 2006, Defendant wrote to Plaintiff that, upon considering Plaintiff's appeal and the results of the medical review of her records, it would uphold its decision to cease paying long term disability benefits.  (Admin. R. 115-16.)  In August 2006, Plaintiff filed her Complaint in the instant suit.

The Plan is governed by Subchapter I of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. 93-104, 88 Stat. 832, 18 U.S.C. §§ 1001-1191c.  Plaintiff has sued for relief pursuant to ERISA, yet the precise provisions of ERISA upon which she bases her claims for relief have never been stated by her.  The Complaint states:

> [T]he Plaintiff respectfully requests that this Honorable Court enter an Order as follows:
> a.  declare that Plaintiff is entitled to a restoration of monthly disability insurance benefits, and continuing benefits as long as Plaintiff remains disabled;
> b.  determine the proper maximum level of monthly benefits that Plaintiff would be entitled to collect;

> c.  award counsel fees together with interest and costs of defending this action and prosecuting this claim;
>
> d.  grant such other relief as justice may require.

(Compl. 4.)  Plaintiff's filings in support of her own summary judgment motion and in response to the instant Motion of Defendant's for summary judgment (Doc. Nos. 15, 22), like the Complaint, do not specify the particular provision of ERISA upon which she bases her claims for relief.  The Court takes it that Plaintiff's claim for relief is brought under 18 U.S.C. § 1132(a)(1)(B), which provides: "A civil action may be brought . . . by a participant . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  18 U.S.C. § 1132(a).

## II.  Legal Standard

A claim under 18 U.S.C. § 1132(a)(1)(B) for benefits requires that a court simply determine, based on the record that was before the Plan administrator and based on the terms of the Plan, what benefits are owed to Plaintiff and then enter judgment accordingly – <u>unless</u> the Plan grants discretion to the Plan administrator to determine benefits owed.  "[G]uided by principles of trust law," the Supreme Court has spoken of the adjudication of § 1132(a)(1)(B) claims in terms of the court's "review" of the decisions of the plan administrator.  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 99, 111, 109 S. Ct. 948, 954, 103 L. Ed. 2d. 80 (1989).  Where the review is of a decision by an administrator to whom the plan grants discretion in determining benefits owed, the court's review is not de novo, but rather is for abuse of discretion, which is to say that the court reviews the administrator's decision under "[t]he 'arbitrary and capricious'

standard." Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 & nn.4-5 (3d Cir. 1993).[2] "Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 45 (internal quotes omitted).

The level of scrutiny rises, however, if the administrator "is operating under a conflict of interest," in which case "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone, 489 U.S. at 115, 109 S. Ct. at 957 (quoting Restatement (Second) of Trusts § 187 cmt. d ( 1959)). Generally, we have an instance of such a conflict of interest when "the employer . . . pay[s] an independent insurance company to fund, interpret, and administer a plan." Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000). Under the typical arrangement of this sort, for each denial of benefits to plan participants, the insurance company administering the plan receives a direct benefit and, at least where the claim for benefits denied was a close case, suffers no adverse consequence. Id. at 388. Hence, the plan administrator has an interest that conflicts with its fiduciary duty to the plan participants, 29 U.S.C. § 1104. Because of this conflict, "a heightened standard of review" is "appropriate." Pinto, 214 F.3d at 389.

Precisely how heightened the review should be depends on the circumstances peculiar to the benefit plan at issue, "each case to be examined on its facts." Id. at 392. The Pinto court emphasized that even the decision to heighten the arbitrary and capricious standard of review at

---

[2]In this context, it is common for the terms "abuse of discretion" and "arbitrary and capricious" to be used interchangeably, as the terms were used by the Third Circuit in Abnathya. Cf. Block v. Pitney Bowes, Inc., 952 F.2d 1450, 1454 (D.C. Cir. 1992) (Ruth Bader Ginsburg, J.) ("The distinction, if any, between 'arbitrary and capricious review' and review for 'abuse of discretion' is subtle.").

<u>all</u> should not be made mechanically: "We do not, of course, pretend to establish an absolute, per se rule, recognizing that different relationships between the parties could effect a different result." <u>Id.</u> at 388 n.6.  As more recently summarized by the Third Circuit, there is

> a nonexclusive list of factors to consider in assessing whether a structural conflict of interest warranting heightened review exists. . . .  Among the factors . . . [are] the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company.  Also relevant is the current status of the fiduciary, i.e., whether the decisionmaker is a current employer, former employer, or insurer.

<u>Kosiba v. Merck & Co.</u>, 384 F.3d 58, 64 (3d Cir. 2004) (internal quotes and citations omitted).  Furthermore, "at least one more cause for heightened review" would be constituted by a "demonstrated procedural irregularity, bias or unfairness in the review of the claimant's application for benefits."  <u>Id.</u> at 66.

Given the extremely fact-intensive nature of a court's decision as to whether and how far an abuse of discretion standard should be heightened, it is obviously essential that the court, in order to make this decision, have all the relevant facts fully on display.  Should the parties fail to present the court with facts relevant to this decision, then, to that extent, the court will have to fall back on a default standard of review.  The Third Circuit Court of Appeals has made clear that, once it has been found that the plan grants discretion to the administrator, then the default standard of review is "the traditional arbitrary and capricious standard."  <u>Bill Gray Enters., Inc. Employee Health and Welfare Plan v. Gourley</u>, 248 F.3d 206, 216 (3d Cir. 2001).  It is up to the claimant to "document" her "contentions" as to the existence of conflicts requiring a heightening of that standard of review.  <u>See</u> <u>Skretvedt v. E.I. DuPont de Nemours & Co.</u>, 268 F.3d 167, 174 n.5 (3d Cir. 2001).

In the instant case, the Plan provides that Defendant "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Admin. R. 8.) Therefore, absent any documentation of factors requiring the standard of review to be heightened, the default standard for the Court's review of Defendant's decision to cease paying benefits is the arbitrary and capricious standard.

Plaintiff argues, however, that "this Court should exercise a substantially heightened standard of review." (Pl's Mem. 2.) Plaintiff's argument is that the arbitrary and capricious standard should be "substantially heightened" because the procedure by which Defendant decided to cease paying benefits to Plaintiff was marked by irregularities and by an inherent unfairness.[3] Yet Plaintiff utterly fails to document any procedural irregularities or inherent unfairness that would warrant heightening the arbitrary and capricious standard. Rather, Plaintiff merely mischaracterizes the record submitted by Defendant.

Thus, for example, Plaintiff states:

> Beginning in April of 2005, the Hartford began complaining about problems with one of Plaintiff's treating physicians, Dr. Vidhub Gupta . . . . The problems concerned the receipt of appropriate records from Dr. Gupta to various Defendant requests.
> The Defendant also had some documented animus with another of Plaintiff's

---

[3]Plaintiff's presentation of the argument is brief and can be quoted in full:

It is clear that the Defendant, Hartford's procedural process, at all times leading up to and including its denial of Ms. Gibson's benefits, were [sic] replete with numerous incidence [sic] of confusion, irregularity and miscommunication. There is also a degree of unfairness in the review and appeal of Defendant's denial. Furthermore, it is Plaintiff's position that Hartford never truly communicated its basis for its ultimate decision in violation of 29 U.S.C. Sec. 1133. The Administrative Record clearly indicates that there was confusion between the internal physicians employed by Hartford, the Plaintiff's treating physicians and the IME physician retained by Hartford.

(Pl's Mem. 2.)

> treating physicians, Dr. Mohan Gurubhagavatula. The administrative record clearly
> sounds the agitation of the Defendant in getting the Doctor to respond to Defendant's
> numerous requests.

(Pl's Mot. for Summ. J. ¶¶ 7-8.) In fact, the 378-page record submitted to the Court contains

nothing reflecting any "animus" towards Dr. Gurubhagavatula or reflecting any "complaints"

about "problems" with Dr. Gupta. Notably, Plaintiff fails to cite any particular portion of the

administrative record.

Regarding the alleged "complaints" concerning Dr. Gupta, the Court's review of the

documents filed with the Court reveals nothing more than that, approximately two months after

Plaintiff's application for benefits, Defendant wrote to Plaintiff that it had not yet decided on her

application because, as Defendant had previously noted (Admin. R. 295), it had not yet received

medical records that it had requested from Dr. Gupta. (Admin. R. 294.) It appears that Dr.

Gupta forwarded the medical records soon thereafter, since just three weeks later, on May 5,

2005, Defendant wrote to Plaintiff that her claim for benefits was approved effective February

28, 2005. (Admin. R. 248-51.)

As for the allegation of "animus" towards Dr. Gurubhagavatula, it has no ground

whatsoever. The record shows that on more than one occasion Defendant advised Plaintiff that it

was awaiting materials it had requested from Dr. Gurubhagavatula in order to decide Plaintiff's

claim. (Admin. R. 212, 217, 244.) The record also contains the following notation in the

medical review of Plaintiff's records that was commissioned by Defendant and undertaken by Dr.

Dennis Dayton Payne in May 2006:

> Discussion with Attending Provider:
>
> I attempted the first teleconference with Dr. Gurubhagavatula on 05/16/2006. I was able

to leave a message on the voice mail of the office.  Dr. Gurubhagavatula returned my call on 05/17/2006.  A message was left for me to contact him by noon that day.  I called at 1150 [sic] and left another message with his staff but he was unable to discuss the case with me that day.  My next teleconference attempt with Dr Gurubhagavatula was 05/18/2006.  A message was left with contact numbers on the answering machine as requested.  I did not receive a return call.

(Admin. R. 119.)  Finding nothing more than this on which to base Plaintiff's allegation of "animus," the Court concludes that the allegation, supported by no citation to any particular portion of a lengthy record, is entirely baseless.

In <u>Pinto</u>, the Third Circuit stated: "[W]e find ourselves on the far end of the arbitrary and capricious 'range,' and we examine the facts before the administrator with a high degree of skepticism."  <u>Pinto</u>, 213 F.3d at 394.  The basis for that extreme heightening of the arbitrary and capricious standard was a combination of factors: the conflict of interest created by the defendant's dual role as "both plan administrator and funder," <u>id.</u> at 387, combined with "procedural anomalies" that the court noted in that particular case, <u>id.</u> at 394.  In the instant case, this Court notes a conflict of interest created by Defendant's dual role as plan administrator and funder, but rejects Plaintiff's allegation of irregularities and inherent unfairness in the procedural history of Plaintiff's benefit claim.  Consequently, this Court applies a moderately heightened arbitrary and capricious standard as it reviews Defendant's decision to cease paying benefits to Plaintiff.

Since the issue has been brought forward on a motion for summary judgment, the Court is directed by Rule 56 of the Rules of Civil Procedure to look for any "genuine issue as to any material fact."  Fed. R. Civ. P. 56.  An opinion of the Court of Appeals for the Ninth Circuit uses this language from Rule 56 with reference to an ERISA claim for benefits: The court announced

8

that its task was to determine whether any "genuine issues of fact exist as to whether the [plan administrator] abused its discretion by denying [the claimant] benefits under the retirement plan." Bergt v. Ret. Plan for Pilots Employed by Markair, Inc., 293 F.3d 1139, 1142-43 (9th Cir. 2002). As pointed out by the First Circuit, however, the Bergt court's formulation is not helpful.  Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002).   It is not irrelevant that a plaintiff seeking relief under 29 U.S.C. § 1132(a)(1)(B) has no right to a jury trial since the relief sought is equitable, Cox v. Keystone Carbon Co., 894 F.2d 647, 649-50 (3d Cir. 1990), although even in an action seeking only equitable relief, "if genuine issues of fact do exist, summary judgment must be denied," 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2731 at 98 (3d ed. 1998).  More to the point, in an ERISA claim for benefits, "the district court sits more as an appellate tribunal than as a trial court."  Leahy, 315 F.3d at 18. The Court's review is undertaken by examining "the record as a whole," meaning the "evidence that was before the administrator when he made the decision being reviewed."  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997).  In the instant case, the moderately heightened arbitrary and capricious standard of review is applicable not only to Defendant's interpretations of the Plan but also to Defendant's findings of fact.[4]  District court judges who, on cross-motions for summary judgment, have found a plan administrator's record too thin either to uphold or to reject the plan administrator's decision have remanded the benefits claim to the plan administrator for supplementation of the record.  See, e.g., Mitchell, 113 F.3d at 436.  Third

---

[4]The Plan grants to Defendant discretion both to "interpret all terms and provisions" of the Plan and to "determine eligibility for benefits."  (Admin. R. 8.)  Hence factual determinations, as well as interpretive determinations, are within the scope of Defendant's discretion.  Cf. Mitchell, 113 F.3d at 438.

Circuit opinions review Rule 56 summary judgment dispositions in 29 U.S.C. § 1132(a)(1)(B) cases without mentioning the language typically recited as the standard of review for a Rule 56 motion.  See, eg., Gritzer v. CBS, Inc., 275 F.3d 291, 295-96 (3d Cir. 2002); Mitchell, 113 F.3d at 437-39.  This Court's focus is on whether Defendant's decision to cease benefit payments can pass muster, considering the evidence that Defendant had before it and subjecting Defendant's decision to a moderately heightened arbitrary and capricious standard of review.

## III. The Record

A.  The terms of the Plan

> The record shows that the Plan assures long term disability benefits to participants who:
>
> (1) become Totally Disabled;
> (2) remain Totally Disabled throughout the Elimination Period;[5]
> (3) remain Disabled beyond the Elimination Period; and
> (4) submit proof of loss satisfactory to The Hartford.

(Admin. R. 17.)  The term "Totally Disabled" is defined as follows:

> Total Disability or Totally Disabled means that:
> (1) during the Elimination Period; and
> (2) for the next 12 months, you are prevented by:
> > (a) accidental bodily injury;
> > (b) sickness;
> > (c) Mental Illness;
> > (d) substance abuse; or
> > (e) pregnancy,
> from performing the essential duties of your occupation, and are under the continuous care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.
> > After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.
> > "Your occupation" includes similar job positions with the Employer which may

---

[5]The "Elimination Period" is a defined period of time at the outset of the period of Total Disability.  (Admin. R. 4.)  Benefits do not accrue until after the Elimination Period ends. (Admin. R. 17.)

be offered to you, with a rate of pay 60% or greater of your indexed Pre-disability Earnings.

(Admin. R. 8.)

According to this definition of "Totally Disabled," the criterion of Total Disability changes at the twelve month mark following the end of the Elimination Period.  Before that twelve month mark, the issue is whether a participant can perform her own occupation, the occupation she held while covered by the Plan; after the twelve months pass, the issue is whether a participant can perform any occupation the essential duties of which she is qualified by education, training or experience to perform.  Defendant's cessation of benefit payments to Plaintiff was based on Defendant's determination that Plaintiff, although initially qualifying as Totally Disabled since she could not perform the essential duties of her Wal-Mart occupation, subsequently was no longer Totally Disabled since there existed "occupation[s] for which [she was] qualified by education, training or experience" and the essential duties of which she could perform.

B.  Medical assessments

The Administrative Record contains the following medical records and medical assessments of Plaintiff's abilities:

1.   An  "Attending Physician's Statement of Disability."  This is part of a form that Defendant supplies to plan participants for use in applying for long term disability benefits.  Here, this part of the form has been filled out and signed by Plaintiff's attending physician, Dr. Gurubhagavatula, on March 4, 2005.  Dr. Gurubhagavatula is a specialist in rheumatology.  (Admin. R. 360-61.)

2.   Fifty pages of medical records from Dr. Gurubhagavatula's office, sent to Defendant on March 17, 2005.  (Admin. R. 304-54.)

3.   Twenty-eight pages of medical records from the office of Dr. Gupta, a neurologist

11

to whom Dr. Gurubhagavatula referred Plaintiff for tests.  These records were apparently sent to Defendant in late April or early May 2005.  (Admin. R. 265-93.)

4.      A second "Attending Physician's Statement of Disability," again filled out by Dr. Gurubhagavatula, but this one dated October 4, 2005.  (Admin. R. 215-16.)

5.      Fourteen pages of medical records from Dr. Gurubhagavatula's office, sent to Defendant on December 16, 2005.  (Admin. R. 197-210.)

6.      An Independent Medical Expert ("IME") Report by Dr. Guy Fried, dated February 15, 2006, with a "Physical Capacities Evaluation Form" filled out by Dr. Fried and dated February 23, 2006, and Dr. Fried's responses to a questionnaire, dated February 24, 2006.  (Admin. R. 133-41.)  According to Defendant, Dr. Fried is a medical doctor "of the Magee Rehabilitation Jefferson Health System."  (Def's Statement of Undisputed Material Facts (Doc. No. 14) ¶ 35.)  It is not entirely clear what Dr. Fried's area of specialization is, but there is a suggestion in the Administrative Record that he is a physiatrist.[6]  (Admin. R. 187-88.)

7.      A letter dated February 27, 2006, sent by Defendant to Dr. Gurubhagavatula asking whether he agrees or disagrees with the IME Report.  Dr. Gurubhagavatula has marked a space provided in the letter to indicate that he agrees with the Report.  (Admin. R. 170.)

8.      A letter dated April 19, 2006, from Dr. Gurubhagavatula "to whom it may concern."  (Admin. R. 122.)

9.      The report of a review of Plaintiff's medical records by Dr. Dayton Dennis Payne, dated May 24, 2006.  (Admin. R. 117-120.)  Dr. Payne is "Board Certified in Internal Medicine and Rheumatology."  (Admin. R. 116.)

The first of these nine items, the "Attending Physician's Statement of Disability" completed by Dr. Gurubhagavatula on March 4, 2005, states that Plaintiff suffers from "diffuse pain, swelling, pain, tenderness in multiple joints."  (Admin. R. 360.)  In the space provided for

---

[6]"A phsyiatrist . . . is a physician specializing in physical medicine and rehabilitation." Am. Acad. of Physical Med. & Rehabilitation, Frequently Asked Questions, http://www.aapmr.org/condtreat/what.htm.  "Physical Medicine and Rehabilitation . . . is the branch of medicine emphasizing the prevention, diagnosis and treatment of disorders – particularly those of the musculoskeletal, cardiovascular, and pulmonary systems – that may produce temporary or permanent impairment."  Id.

the "primary diagnosis," Dr. Gurubhagavatula wrote: "inflammatory arthropathy"; as the "secondary diagnosis," he wrote: "fibromyalgia."[7]  (Id.)  Dr. Gurubhagavatula also wrote here that Plaintiff "can stand for only 15 min[utes]," can walk only one block, has "no impairment" with respect to sitting, can lift or carry approximately five pounds "at best," cannot reach overhead, cannot push or pull (due to pain), cannot drive (due to fatigue) and cannot use a keyboard or engage in repetitive hand motion.

The second of these nine items – the fifty pages of medical records forwarded to Defendant by Dr. Gurubhagavatula on March 17, 2005 – reveals that between April 2004 to January 2005 Dr. Gurubhagavatula examined Plaintiff on five occasions.  The first occasion was on April 22, 2004, when Dr. Gurubhagavatula examined Plaintiff "because of diffuse musculoskeletal pains."  (Admin. R. 327.)  A letter by Dr. Gurubhagavatula to the referring doctor records the "presumptive diagnosis" as: "fibromyalgia 2˚ poor sleep."  (Id.)  Some medication was prescribed or recommended for Plaintiff, but the name of the medication is illegible.  (Id.)  The next occasion was on May 27, 2004, when Dr. Gurubhagavatula saw Plaintiff "because of diffuse soft tissue and joint pain," made a presumptive diagnosis of "possible inflammatory arthropathy, such as rheumatoid factor, and 2˚ fibromyalgia," and again prescribed or recommended some medication.[8]  (Admin. R. 324.)  The third occasion was on

---

[7]"Arthropathy" is a general term for "a disease of a joint."  Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical?va=arthropathy. Fibromyalgia is "a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances."  Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical?va=fibromyalgia.

[8]Rheumatoid factor is "an autoantibody . . . that reacts against [certain] immunoglobulins . . . and is often present in rheumatoid arthritis."  Merriam-Webster Medical Dictionary,

August 12, 2004; Dr. Gurubhagavatula made a presumptive diagnosis of "rheumatoid arthritis"

and again prescribed or recommended some medication.  (Admin. R. 321.)  The fourth occasion

was on September 1, 2004, when Plaintiff called Dr. Gurubhagavatula's office and asked

whether she could be examined right away since she was "[i]n excruciating pain" and unable to

go to work.  (Admin. R. 343.)  Dr. Gurubhagavatula examined her that day, again made a

presumptive diagnosis of rheumatoid arthritis, and again prescribed or recommended some

medication.  (Admin. R. 319.)  The fifth occasion was on January 6, 2005; Dr. Gurubhagavatula

again made a presumptive diagnosis of rheumatoid arthritis and again prescribed or

recommended some medication.  (Admin. R. 314.)

　　　　Dr. Gurubhagavatula then referred Plaintiff to Dr. Gupta.  Dr. Gurubhagavatula's records

contain a detailed, two-page letter that on February 18, 2005, Dr. Gupta wrote summarizing his

findings and his impression of Plaintiff.  This letter by Dr. Gupta is one of the more revealing

documents in the administrative record, and so it is quoted here at length:

> Dear Mohan:
>
> Thank you for referring me this 38-year-old lady, with a history of depression, migraine headaches, predominately catamenial migraine headaches, rheumatoid factor negative rheumatoid arthritis, for the evaluation of various symptoms.
>
> As per the patient, from the last three years or so she has slowly progressively increasing symptoms in the form of feeling fatigued, tired, legs want to give out on her, difficulty going up-and-down stairs, difficulty doing over-the-head work.  Also complains of diffuse muscle aches and pains in the body, all throughout the body. . . . From last few months she also has some difficulty focusing . . . .  She has almost one year history of incontinence of bladder and bowel, more in last four months. . . . She's presently on

---

http://unabridged.merriam-webster.com/cgi-bin/medical?va=rheumatoid+factor.  Rheumatoid arthritis is "a usually chronic disease that is . . . characterized especially by pain, stiffness, inflammation, swelling, and sometimes destruction of joints."  Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical?va=rheumatoid+arthritis.

methotrexate, Plaquenil, and prednisone, prescribed by you, for rheumatoid arthritis.  She is also on Cymbalta for depression, prescribed by Dr. Becker, and Elavil 20 mg at nighttime prescribed by you. . . . .

On examination was found to be a well-nourished, well-built lady in no apparent acute distress. . . .

(Admin. R. 307.)  Dr. Gupta went on to write that a battery of tests would be required in order to "rule out" various possible maladies.  (Admin. R. 308.)

The third of the nine items listed above, the set of medical records forwarded to Defendant by Dr. Gupta, shows the upshot of the tests that Dr. Gupta ordered.  Writing to Dr. Gurubhagavatula on March 2, 2005, Dr. Gupta reported that "extensive neurological work-up has come out unrevealing."  (Admin. R. 268.)  Dr. Gupta also wrote: "She most likely has non-specific benign paresthesias and intractable myofacial pain syndrome as the cause of her various symptoms.  I do not have any other neurological explanation to explain her various symptoms."[9]

---

[9]Paresthesia is "a sensation of pricking, tingling, or creeping on the skin having no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root." Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical?va=paresthesias.  "Myofascial" means "of or relating to the fasciae of muscles."  Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical?book=Medical&va=myofascial.  And "fascia," in turn, means "a sheet of connective tissue . . . covering or binding together body structures."  Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical?va=fasciae.  According to WebMD.com, "Myofascial pain syndrome . . . is a fancy way to describe muscle pain."  WebMd, http://www.webmd.com/pain-management/guide/myofascial-pain-syndrome.  This Web site continues:

Myofascial pain may develop from a muscle injury or from excessive strain on a particular muscle or muscle group, ligament or tendon.  Other causes include:
- Injury to intervertebral disc
- General fatigue
- Repetitive motions
- Medical conditions (including heart attack, stomach irritation)
- Lack of activity (such as a broken arm in a sling)

(Admin. R. 267.)

The fourth of the nine items listed above, the "Attending Physician's Statement of Disability" by Dr. Gurubhagavatula dated October 4, 2005, states that Plaintiff has "retrogressed." (Admin. R. 215.)  Here, Dr. Gurubhagavatula's diagnosis is solely "fibromyalgia ICD 729.0."[10] (Id.)  He states that Plaintiff's symptoms are "pain, stiffness, difficulty walking, muscle aches/spasms."  (Id.)  He also states that Plaintiff experiences pain when standing, uses a cane to walk, has "[n]o deficits in sitting," can lift or carry no more than twenty-five pounds, is limited in her ability to reach overhead, can push or pull no more than five pounds, is "limited" in her ability to drive and "moderately limited" in her ability to use a keyboard or engage in repetitive hand motion.  (Admin. R. 216.)

The medical records sent from Dr. Gurubhagavatula's office to Defendant on December 16, 2005, are not noteworthy.  (Admin. R. 197-210.)

Defendant states that on December 27, 2005, Dr. Gurubhagavatula advised Defendant to order an IME Report.  (See Admin. R. 190 (notes from a conversation with Dr. Gurubhagavatula).)  The IME was performed on February 6, 2006, by Dr. Fried.  His four- page report, the sixth of the nine items listed above, concluded:

---

Id.

[10]"ICD" refers to the "International Classification of Diseases."  Nat'l Center for Health Statistics, Classifications of Diseases and Functioning & Disability, http://www.cdc.gov/nchs/about/otheract/icd9/abticd9.htm.  The form filled out by Dr. Gurubhagavatula refers specifically to "ICD-9," the ninth revision of the ICD.  Entry 729.0 in the ICD-9 index of diseases and injuries is "Rheumatism, unspecified and fibrositis."  ICD-9, http://icd9cm.chrisendres.com/index.php?action=child&recordid=6717.  "Fibrositis" means "rheumatic disorder of fibrous tissue; especially: FIBROMYALGIA."  Merriam-Webster Medical Dictionary, http://unabridged.merriam-webster.com/cgi-bin/medical.

[Plaintiff is a] 39-year-old female who complains of chronic pain.  It is unclear to me what the patient's underlying diagnosis is.  I am not finding any objective findings to correlate with the patient's subjective complaints.  From an objective standpoint, the patient has a normal exam.  From a subjective standpoint, she has complaints which could be attributed to a number of underlying processes.  Her workups have been apparently normal and unimpressive.

She becomes a challenging patient for a physician to treat.  She is on multiple medications to treat her subjective symptoms.  Unfortunately, it is not clear to me how much these medications are helping her or contributing to her various issues such as fatigue.  She will need to follow-up with her treating physicians who may wish to consider weaning some of her medications to see how she does.  I cannot find any obvious unifying diagnosis to explain the patient's symptoms.  She does not appear to fall into any diagnosis to explain the processes.  If she has not undergone psychiatric evaluation, this could be considered as well.  Patients in this category can be very challenging insofar as they may ultimately develop a clear cut treatable diagnosis.  As of yet, it does not appear that Ms. Gibson has any clear-cut diagnosis.  She will be following up with her treating physicians for evaluation and treatment.

From an objective standpoint of her physical exam, there is no reason why she couldn't return back to full-time, full-duty employment.  The patient's subjective complaints of her sleep disorder may make it impractical for her to return back to work.  It is unclear to me how much of this sleep disorder is caused by her multiple medications.

(Admin. R. 137-38.)

The "Physical Capacities Evaluation Form" filled out by Dr. Fried states that Plaintiff can sit for eight hours at a time, can stand for 30 minutes at a time for a total of two hours per day, and can walk for 30 minutes at a time for a total of two hours per day.  (Admin. R. 140.)  It also states that Plaintiff is capable of "occasionally" driving, climbing, balancing, stooping, kneeling, crouching and crawling, and capable of "frequently" reaching above her shoulder, reaching at "desk level," reaching below waist level and using her hands to grip and hold.[11]  (Admin. R. 140-41.)  Dr. Fried noted that these observations "take some of [Plaintiff's] subjective complaints

_____

[11]On the form, the term "occasionally" is identified with the range "1-33%."  The term "frequently" is identified with the range "34-67%."  Another term, "constantly," is identified with the range "68-100%."

into account." (Admin. R. 141.)

Dr. Fried's IME Report, including the Physical Capacities Evaluation Form, was forwarded to Dr. Gurubhagavatula. (Admin. R. 175-84.) A letter from Defendant to Dr. Gurubhagavatula provided a space where Dr. Gurubhagavatula could sign in order for him to indicate agreement with "the report and the restrictions and limitations set forth," and provided another space at which to sign in order to indicate disagreement, adding that Dr. Gurubhagavatula "may add comments below if necessary." (Admin. R. 174.) Dr. Gurubhagavatula signed at the space to indicate that he agreed with the report and the restrictions and limitations set forth by Dr. Fried. (Admin. R. 170.) Dr. Gurubhagavatula also declined to provide comments. The letter is dated February 27, 2006, and a date stamped on the letter apparently shows that Defendant received the letter with Dr. Gurubhagavatula's signature on March 14, 2006. (Id.) This is the seventh of the nine items listed above.

The eighth of the nine above-listed items shows that subsequently (after Plaintiff was informed that her benefit payments would cease) Dr. Gurubhagavatula had second thoughts. This is a "to whom it may concern" letter, handwritten by Dr. Gurubhagavatula. In its entirety, it reads:

> 4/19/06
> Re: Gibson, Denise
>
> To whom it may concern,
>
> This is to verify that Ms. Gibson is under my care. At the current time, she has very limited functionality. She cannot sit/stand/bend/lift/push/pull for any extended time (> 20 min) or manage anything heavy (> 5 lbs). She also has difficulty walking and is using a cane for assistance. She is being evaluated for the possibility of a neuromuscular disease.
>
> Until future notice, she cannot work.

18

Please call if you have questions

/s/ Mohan Gurubhagavatula

(Admin. R. 122.)

Finally, the last medical assessment of Plaintiff is the review by Dr. Payne of Plaintiff's medical records.  As already noted, Dr. Payne's attempts to contact Dr. Gurubhagavatula were unsuccessful.  His report was therefore based solely on his review of the medical records that had been supplied to Defendant by Dr. Gurubhagavatula and Dr. Gupta, the IME Report by Dr. Fried, a "Claimant Questionnaire" and some other laboratory and test results.  (Admin. R. 118.)  Dr. Payne reported that Plaintiff's "symptoms of fibromyalgia are classical."  (Admin. R. 117.) Based on his review, he could find nothing "objective" about Plaintiff "that would support the presence of any degree of restrictions or limitations."  (Admin. R. 119.)  Rather, he wrote: "[T]he medical record data support her being limited primarily due to the chronic widespread pain." (Admin. R. 117.)  He concluded: "[T]here exists no objective findings that would support any degree of restrictions or limitations as a result of any rheumatic disease or syndrome."  (Admin. R. 119.)

C.  The "Employability Analysis Report"

At Defendant's request, a "Rehabilitation Clinical Case Manager" (Def's Statement of Undisputed Material Facts ¶ 45), Charysse Chapman-Black, provided Defendant with an "Employability Analysis Report" that took into account Plaintiff's "education, training and work history" and her "[f]unctional [c]apabilities" in order to identify occupations for which Plaintiff is suited.  (Admin. R. 151.)  The capabilities that were attributed to Plaintiff is provided in an

19

"Ability Profile" that Ms. Chapman-Black entered into a computer program in order to carry out the employability analysis. (Admin. R. 155-57.) The Ability Profile lists a number of "physical demands" and then, for each physical demand, attributes a capability to Plaintiff. For example, the capability attributed to Plaintiff with respect to "stooping," "kneeling," "crouching" and "crawling" is, in each case: "occasionally." The capability attributed with respect to physical demands such as "feeling," "talking" and "hearing" is, in each case: "constantly." Additionally, under the category "Work Functions - Things," for each of the "work functions" of "setting up," "operating-controlling" and "driving-operating," the Ability Profile states: "No." But for the work functions of "manipulating," "tending," "feeding-offbearing" and "handling," the Ability Profile states: "Yes."

Ms. Chapman-Black concluded that Plaintiff "possesses the ability to perform the following occupations: Supervisor, Order Takers; Surveillance-System Monitor; and Routing Clerk." (Admin. R. 151.) According to Ms. Chapman-Black, these occupations are "prevalent in the national economy" and have a "median wage" ranging from $2340 per month to $3418.13 per month. (Id.) (Plaintiff's earnings at Wal-Mart had been $3341.58 per month. (Admin. R. 359.))

D.  Defendant's denial of continued long term disability benefits; Plaintiff's appeal

Defendant's decision to cease paying long term disability benefits was communicated to Plaintiff in a letter dated April 12, 2006. (Admin. R. 82-84.) The letter explains that, in making its decision, Defendant considered Plaintiff's entire file, including Plaintiff's initial February 2005 application for long term disability benefits, a "Claimant Questionnaire" completed by Plaintiff and dated September 20, 2005, Dr. Fried's report, Dr. Gurubhagavatula's response to

the letter asking whether he agreed with Dr. Fried's findings, and Ms. Chapman-Black's

Employability Analysis Report.  (Admin. R. 83.)  Defendant specifically focused on the Physical

Capacities Evaluation Form completed by Dr. Fried, on Dr. Gurubhagavatula's expression of

agreement with "the report and the restrictions set forth" by Dr. Fried and on Ms. Chapman-

Black's Employability Analysis Report.  (Admin. R. 83-84.)  In particular, the letter pointed out:

> The IME physician [Dr. Fried] completed a Physical Capacities Evaluation Form noting
> the following restrictions: can sit 8 hours, can stand 30 minutes at a time for a total of 2
> hours a day, can walk 30 minutes for a total of 2 hours a day, occasionally drive, climb,
> balance, stoop, kneel, crouch and frequently reach above, at, and below waist level.

(Admin. R. 83.)  The letter further recited the three occupations "prevalent in the national

economy" that, according to the Employability Analysis Report, Plaintiff has the physical

capacity and "the transferable skill to perform: Supervisor, Order Takers; Surveillance-System

Monitor; and Routing Clerk."  (Admin. R. 83-84.)

Plaintiff appealed the decision.  She submitted Dr. Gurubhagavatula's "to whom it may

concern" letter to Defendant and a lengthy statement of her own (Admin. R. 121).  Defendant's

upholding of its decision to cease paying benefits was communicated in a letter dated May 26,

2006.  (Admin. R. 115-16.)  Besides Plaintiff's own statement and the "to whom it may concern"

letter from Dr. Gurubhagavatula, quoted in full above, the only other significant addition that had

in the meantime been made to the record was the report by Dr. Payne of his review of Plaintiff's

medical records.  Defendant's letter explains that Defendant discounted the "to whom it may

concern" letter from Dr. Gurubhagavatula since (a) in Defendant's view, given the earlier

endorsement by Dr. Gurubhagavatula of Dr. Fried's report, the "to whom it may concern" letter

constituted a change in opinion, (b) the change in opinion was unsupported by any "clinical data"

21

and (c) the attempts made by Dr. Payne to contact Dr. Gurubhagavatula in order to learn the

reasons for Dr. Gurubhagavatula's change in opinion were unsuccessful.  (Admin. R. 116.)

## IV.  Discussion

According to Plaintiff, the administrative record shows Defendant's decision to cease

paying benefits was "solely based on the fact that rheumatological problems suffered by the

Plaintiff . . . are not objectively verifiable."  (Pl's Mem. 5.)  Plaintiff's assertion is simply

incorrect.  As Defendant wrote to Plaintiff in explaining its decision to cease paying benefits,

Defendant relied primarily on the Physical Capacities Evaluation Form completed by Dr. Fried,

on Dr. Gurubhagavatula's expression of agreement with Dr. Fried's report and with the

restrictions set forth by Dr. Fried and on the Employability Analysis Report that identified three

jobs, each prevalent in the national economy, which Plaintiff has the "transferable skills to

perform" and, based on Dr. Fried's findings, has the capacity to perform.  The letter advising of

the cessation of benefits does not raise, either directly or by implication, issues about whether

"rheumatological problems suffered by [Plaintiff[ . . . are objectively verifiable."

Nevertheless, Plaintiff argues that the instant Motion must be granted since "the

precedent within the Third Circuit holds that it is arbitrary and capricious to require objective

medical evidence in the context of a claim for long-term disability benefits as a result of chronic

fatigue syndrome and fibromyalgia."  (Pl's Mem. 5.)  For this latter proposition, Plaintiff relies

primarily on the Third Circuit's decision in Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d

Cir. 1997).

In Mitchell, a plan administrator's denial of long term benefits to a claimant suffering

from chronic fatigue syndrome was reviewed under an unheightened abuse of discretion

standard.  Even under that forgiving standard, the Third Circuit found that the plan

administrator's decision did not pass muster.  The plan at issue in <u>Mitchell</u> provided for long

term benefits in case the claimant was "unable to engage in any substantial gainful work."  <u>Id.</u> at

442.  The plan administrator had denied benefits because the claimant "had failed to tender

'objective medical evidence' that he" met this requirement.  <u>Id.</u>  The Third Circuit rejected that

basis for denying benefits, pointing out that if by "objective medical evidence" the plan

administrator meant evidence sufficient to persuade the plan administrator that the claimant

could not engage in any substantial gainful work, then the decision to deny benefits was based on

a severe mischaracterization of the administrative record.  <u>Id.</u>  On the other hand, if by "objective

medical evidence" the plan administrator meant "clinical evidence of the etiology of allegedly

disabling symptoms," then the decision to require such evidence before paying benefits was

arbitrary and capricious, given that chronic fatigue syndrome has no known etiology.  <u>Id.</u> at 442-

43.

> Although in some contexts it may not be arbitrary and capricious to require clinical
> evidence of the etiology of allegedly disabling symptoms in order to verify that there is no
> malingering, we conclude that it was arbitrary and capricious to require such evidence in
> the context of [Mitchell's] Plan and [chronic fatigue syndrome].

<u>Id.</u>

Plaintiff argues that the instant case is analogous to <u>Mitchell</u>:  Her symptoms of

fibromyalgia render her unable to work, but the nature of fibromyalgia is such that, as Dr. Fried

reported, there are no "objective findings" – that is, no known etiology of the symptoms – "to

correlate with the patient's subjective complaints" (Admin. R. 137).

<u>Mitchell</u> is not, however, analogous.  The record in this case unequivocally demonstrates

23

that Defendant never demanded an identification of the etiology of Plaintiff's symptoms.  Nor

does it appear that Defendant held the absence of etiological findings in cases of fibromyalgia

against Plaintiff.  Rather, the record amply demonstrates that, in deciding Plaintiff is not "totally

disabled" within the meaning of the Plan, Defendant relied upon the Physical Capacities

evaluation form in which Dr. Fried assessed the frequency with which Plaintiff could perform

basic physical activities such as grasping with her hands and exercising fine motor skills with her

fingers.[12]  (Admin. R. 140-41.)  The record further demonstrates that the second critical basis of

Defendant's decision was Dr. Gurubhagavatula's agreement with Dr. Fried's assessment of

Plaintiff's abilities.  Finally, Defendant considered other occupations prevalent in the national

economy which Plaintiff has the ability to perform.  Thus, under the language of the Plan,

Plaintiff was not "totally disabled" in the sense of being "prevented from performing the essential

duties of any occupation for which [she is] qualified by education, training or experience"

(Admin. R. 8).  The record simply fails to demonstrate that the decision to deny benefits was

based on the absence of a known etiology for Plaintiff's symptoms.  Additionally, a review of the

record fails to lead to the conclusion that the denial of benefits was "without reason, unsupported

by substantial evidence or erroneous as a matter of law," Abnathya v. Hoffman-La Roche, Inc., 2

F.3d 40, 45 (3d Cir. 1993) (internal quotes omitted) (describing the unheightened abuse of

discretion standard) and fails to lead to the conclusion that the denial was unsound even under a

moderately heightened abuse of discretion standard.

      Nor may it be fairly said that, under the moderately heightened abuse of discretion

_____

     [12]Dr. Fried noted that in making these assessments he took "some of [Plaintiff's]
subjective complaints into account."  (Admin. R. 141.)

standard, Defenant's denial of Plaintiff's appeal was unsound.  Dr. Payne, the independent

reviewer, examined the entire medical record, examined Dr. Gurubhagavatula's "to whom it may

concern" letter and examined a letter from Plaintiff received May 15, 2006, chronicling her

symptoms.  As for Dr. Gurubhagavatula's letter "to whom it may concern," it was reasonable for

Defendant to discount this letter given that Dr. Gurubhagavatula neither provided an adequate

explanation for the view expressed in that letter nor made a reasonable effort to return Dr.

Payne's telephone calls when Dr. Payne sought to discuss the matter with him.

**V.  Conclusion**

Under the moderately heightened abuse of discretion standard of review that the Court

applies in the instant case, the administrative record provides adequate support for Defendant's

decision to cease paying benefits to Plaintiff.  Therefore, the instant Motion of Defendant's (Doc.

No. 13) is granted.  An appropriate Order follows.